875 A.2d 259 (2005)
378 N.J. Super. 168
Mark LEWIS and Dennis Winslow; Saundra Heath and Clarita Alicia Toby; Craig Hutchison and Chris Lodewyks; Maureen Kilian and Cindy Meneghin; Sarah and Suyin Lael; Marilyn Maneely and Diane Marini; and Karen and Marcye Nicholson-McFadden, Plaintiffs-Appellants,
v.
Gwendolyn L. HARRIS, in her official capacity as Commissioner of the New Jersey Department of Human Services; Clifton R. Lacy, in his official capacity as the Commissioner of the New Jersey Department of Health and Senior Services; and Joseph Komosinski, in his official capacity as Acting State Registrar of Vital Statistics of the New Jersey State Department of Health and Senior Services, Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued December 7, 2004.
Decided June 14, 2005.
*261 David S. Buckel (Lambda Legal Defense and Education Fund, Inc.) of the New York bar, admitted pro hac vice, New York City, argued the cause for appellants (Gibbons, Del Deo, Dolan, Griffinger & Vecchione and Mr. Buckel, attorneys; Lawrence S. Lustberg and Jennifer Ching (Gibbons, Del Deo, Dolan, Griffinger & Vecchione), Newark, Mr. Buckel and Susan L. Sommer (Lambda Legal Defense and Education Fund, Inc.), on the brief).
Patrick DeAlmeida, Assistant Attorney General, argued the cause for respondents (Peter C. Harvey, Attorney General, attorney; Mr. DeAlmeida, of counsel; Mr. DeAlmeida and Mary Beth Wood, Deputy Attorney General, on the brief).
Messina & Laffey, for amicus curiae the New Jersey Catholic Conference, the New Jersey Coalition to Preserve and Protect Marriage, the New Jersey Family Policy Council and Mr. and Mrs. David C. Heslington (Joshua K. Baker, Lincoln C. Oliphant and William C. Duncan, of counsel; Michael Behrens, on the brief).
Dennis M. Caufield, for amicus curiae the Family Research Council (Glen Lavy, Byron Babione and Dale Schowengerdt (Alliance Defense Fund), of counsel; Mr. Caufield, on the brief).
*262 Levow & Costello, for amicus curiae Legal Momentum (Jennifer Brown and Deborah Widiss (Legal Momentum), Elizabeth L. Rosenblatt and Douglas NeJaime (Irell & Manella), of counsel; Kevin Costello, on the brief).
Blank Rome, for amicus curiae National Association of Social Workers and National Association of Social Workers New Jersey Chapter (Carolyn Polowy and Sherri Morgan, of counsel; Stephen M. Orlofsky and Jordana Cooper, on the brief).
American Civil Liberties Union of New Jersey Foundation, for amicus curiae American Civil Liberties Union of New Jersey, American-Arab Anti-Discrimination Committee, Asian American Legal Defense and Education Fund, Hispanic Bar Association of New Jersey, National Organization for Women of New Jersey, and the National Organization for Women Legal Defense and Education Fund (Edward Barocas, on the brief).
Nashel, Kates, Nussman, Rapone & Ellis, for amicus curiae American Psychological Association and New Jersey Psychological Association (Paul M. Smith and William M. Hohengarten (Jenner & Block), and Nathalie F.P. Gilfoyle (American Psychological Association), of counsel; Howard M. Nashel, on the brief).
Weinstein Snyder Lindemann Sarno, for amicus curiae Professors of the History of Marriage, Families, and the Law (Suzanne B. Goldberg (Rutgers School of Law, Newark), of counsel; Jeffrey P. Weinstein, on the brief).
Latham & Watkins, for amicus curiae Human Rights Campaign, Human Rights Campaign Foundation, Children of Lesbians and Gays Everywhere (COLAGE), Family Pride Coalition, Freedom to Marry, Gay & Lesbian Advocates & Defenders (GLAD), National Center for Lesbian Rights, National Gay and Lesbian Task Force, New Jersey Lesbian and Gay Coalition (NJLGC), and Parents, Families and Friends of Lesbians and Gays (PFLAG) (Alan E. Kraus, Richard S. Zbur, Stuart S. Kurlander, Charles J. Butler and Jeffrey R. Hamlin (Latham & Watkins), and Elizabeth A. Seaton (Human Rights Campaign), on the brief).
Lowenstein Sandler, for amicus curiae City of Asbury Park (Douglas S. Eakeley, of counsel and on the brief).
Demetrios K. Stratis, for amicus curiae Monmouth Rubber & Plastics Corp. and John M. Bonforte, Sr. (Mr. Stratis and Vincent P. McCarthy and Kristina J. Wenberg (American Center for Law & Justice, Northeast, Inc.), on the brief).
Campbell & Campbell, for amicus curiae United Families International and United Families New Jersey (Donald D. Campbell, Paul Benjamin Linton and Richard G. Wilkins, on the brief).
Anderl & Oakley, for amicus curiae Alliance for Marriage (David R. Oakley and Dwight G. Duncan, on the brief).
Before Judges SKILLMAN, COLLESTER and PARRILLO.
The opinion of the court was delivered by
SKILLMAN, P.J.A.D.
The issue presented by this appeal is whether the New Jersey Constitution compels the State to allow same-sex couples to marry. We conclude that the statutory limitation of the institution of marriage to members of the opposite sex does not violate our Constitution.
Plaintiffs are seven same-sex couples. Defendants are state officials with supervisory responsibilities relating to local officials' issuance of marriage licenses. Plaintiffs' complaint alleges that each couple applied for a marriage license in the municipality *263 in which they reside, but the clerk refused to issue the license because New Jersey law does not authorize a marriage between members of the same sex. Plaintiffs claim that the denial of their applications for marriage licenses violates their rights of privacy and equal protection of the law protected by the New Jersey Constitution. Plaintiffs do not contend that New Jersey's marriage statutes authorize a marriage between members of the same sex or that the limitation of marriage to members of the opposite sex violates the United States Constitution. As relief for the claimed violations of their state constitutional rights, plaintiffs sought a mandatory injunction compelling the defendant state officials to provide them access to the institution of marriage on the same terms and conditions as a couple of the opposite sex.
Defendants filed a motion to dismiss plaintiffs' complaint pursuant to R. 4:6-2(e) on the ground that it fails to state a claim upon which relief can be granted. Plaintiffs filed a cross-motion for summary judgment. After oral argument, defendants' motion was converted to a motion for summary judgment.
The trial court issued a comprehensive written opinion rejecting plaintiffs' claims and upholding the constitutionality of New Jersey's statutory provisions that only allow members of the opposite sex to marry. In rejecting plaintiffs' claim that they have a fundamental right to marry and that the State violated this right by refusing to issue them marriage licenses, the court stated:
The right to marry has always been understood in law and tradition to apply only to couples of different genders. A change in that basic understanding would not lift a restriction on the right, but would work a fundamental transformation of marriage into an arrangement that could never have been within the intent of the Framers of the 1947 Constitution. Significantly, such a change would contradict the established and universally accepted legal precept that marriage is the union of people of different genders.
In rejecting plaintiffs' equal protection claim, the court stated:
Plaintiffs, like anyone else in the state, may receive a marriage license, provided that they meet the statutory criteria for marriage, including an intended spouse of the opposite gender. Plaintiffs are, in that sense, in the same position as all other New Jersey residents. The State makes the same benefit, mixed-gender marriage, available to all individuals on the same basis. Whether or not plaintiffs wish to enter into a mixed-gender marriage is not determinative of the statute's validity. It is the availability of the right on equal terms, not the equal use of the right that is central to the constitutional analysis. Plaintiffs seek not to lift a barrier to marriage, but to change its very essence.
Based on this opinion, the trial court entered final judgment dismissing plaintiffs' complaint.
During the pendency of this appeal, the Legislature enacted the Domestic Partnership Act, L. 2003, c. 246, which confers substantial legal rights upon same-sex couples who enter into domestic partnerships corresponding in many respects to the rights of opposite-sex couples who marry. This new legislation, which was enacted on January 12, 2004 and became effective on July 10, 2004, L. 2003, c. 246, § 60, is based on legislative findings and declarations that "[t]here are a significant number of individuals in this State who choose to live together in important personal, emotional and economic committed relationships with another individual," N.J.S.A. *264 26:8A-2(a); that "[t]hese familial relationships, which are known as domestic partnerships, assist the State by their establishment of a private network of support for the financial, physical and emotional health of their participants," N.J.S.A. 26:8A-2(b); and that "[b]ecause of the material and other support that these familial relationships provide to their participants, the Legislature believes that these mutually supportive relationships should be formally recognized by statute, and that certain rights and benefits should be made available to individuals participating in them," N.J.S.A. 26:8A-2(c). The Domestic Partnership Act also contains a legislative declaration that:
The need for all persons who are in domestic partnerships, regardless of their sex, to have access to these rights and benefits is paramount in view of their essential relationship to any reasonable conception of basic human dignity and autonomy, and the extent to which they will play an integral role in enabling these persons to enjoy their familial relationships as domestic partners and to cope with adversity when a medical emergency arises that affects a domestic partnership.
[N.J.S.A. 26:8A-2(d).]
To accomplish these legislative objectives, the Domestic Partnership Act provides that members of the same sex who "have a common residence and are otherwise jointly responsible for each other's common welfare as evidenced by joint financial arrangements or joint ownership of real or personal property," N.J.S.A. 26:8A-4(b)(1), who "agree to be jointly responsible for each other's basic living expenses during the domestic partnership," N.J.S.A. 26:8A-4(b)(2), and who satisfy the other statutory prerequisites of such a State-sanctioned union, see N.J.S.A. 26:8A-4(b)(3) to (9), are entitled to receive a Certificate of Domestic Partnership, N.J.S.A. 26:8A-8(b). Upon issuance of this certificate, a patient's domestic partner and his or her children have the same right of visitation in a health care facility as a patient's spouse or children. N.J.S.A. 26:2H-12.22. In addition, a domestic partner is authorized to consent to an autopsy upon the body of his or her partner, N.J.S.A. 26:6-50, and has the same right as a spouse to consent to donation of a deceased domestic partner's organs for statutorily approved purposes, N.J.S.A. 26:6-58(b)(1). The Domestic Partnership Act also amends the State's tax laws to give domestic partners the same exemption from the State's inheritance tax provided to married couples, N.J.S.A. 54:34-1(f); N.J.S.A. 54:34-2(a); N.J.S.A. 54:34-1(j), the same $1,000 exemption from the State gross income tax that can be claimed for a spouse who does not file a separate return, N.J.S.A. 54A:3-1, and the right to claim a domestic partner as a "dependent" under the Gross Income Tax Act, N.J.S.A. 54A:1-2(e). Moreover, a domestic partner of a State employee is entitled to the same benefits under the State pension laws and State Health Benefits Program as a spouse, N.J.S.A. 18A:66-2; N.J.S.A. 43:6A-3; N.J.S.A. 43:15A-6; N.J.S.A. 43:16A-1; N.J.S.A. 52:14-17.26; N.J.S.A. 53:5A-3, and private insurance companies that provide dependent coverage for health, hospital, medical and dental expenses benefits must provide such coverage for a covered person's domestic partner, N.J.S.A. 17:48A-7aa; N.J.S.A. 17:48D-9.5; N.J.S.A. 17:48E-35.26; N.J.S.A. 17B:26-2.1x; N.J.S.A. 17B:27-46.1bb; N.J.S.A. 17B:27A-7.9; N.J.S.A. 17B:27A-19.12; N.J.S.A. 26:25-4.27; N.J.S.A. 26:8A-11; N.J.S.A. 34:11A-20. In addition, the Act amends the Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -42, to extend the prohibitions of that statute to discrimination on the basis *265 of domestic partnership status. L. 2003, c. 246, § 12.
As a result of enactment of the Domestic Partnership Act, which extends many of the economic benefits and regulatory protections of marriage to persons of the same sex who enter into domestic partnerships, plaintiffs may now avoid many of the adverse consequences of being denied the opportunity to marry alleged in their complaint, such as denial of the right to participate in family insurance plans, denial of hospital visitation rights, denial of the right to make health care decisions when their partner is incapacitated, denial of the right to bury and control the disposition of a partner's remains, and denial of the benefit of the protections against discrimination provided by the LAD, by entering into domestic partnerships. The record does not indicate whether any of the plaintiff couples have entered into or plan to enter into domestic partnerships because the case was heard in the trial court before enactment of the Domestic Partnership Act. Consequently, this case does not involve any claim of a denial of constitutional rights to same-sex domestic partners on the ground that they are not afforded all the benefits and rights of opposite-sex married couples. Rather, plaintiffs' claim is that even if the Domestic Partnership Act conferred all the benefits and legal rights of marriage, the New Jersey Constitution would nevertheless compel recognition of same-sex marriage.
In reviewing the constitutionality of the statutes that limit marriage to members of the opposite sex, as in reviewing any other statute, we must keep in mind that those provisions "represent[] the considered action of a body composed of popularly elected representatives" and therefore are entitled to a strong presumption of validity. N.J. Sports & Exposition Auth. v. McCrane, 61 N.J. 1, 8, 292 A.2d 545 (1972), appeal dismissed sub. nom., Borough of E. Rutherford v. N.J. Sports & Exposition Auth., 409 U.S. 943, 93 S.Ct. 270, 34 L.Ed.2d 215 (1972). This presumption "can be rebutted only upon a showing that the statute's `repugnancy to the Constitution is clear beyond a reasonable doubt.'" Hamilton Amusement Ctr. v. Verniero, 156 N.J. 254, 285, 716 A.2d 1137 (1998) (quoting Harvey v. Bd. of Chosen Freeholders, 30 N.J. 381, 388, 153 A.2d 10 (1959)), cert. denied, 527 U.S. 1021, 119 S.Ct. 2365, 144 L.Ed.2d 770 (1999). The personal views of the members of the court concerning "the wisdom or policy of a statute" should play no part in determining its constitutionality. N.J. Sports & Exposition Auth., supra, 61 N.J. at 8, 292 A.2d 545. A constitution is not simply an empty receptacle into which judges may pour their own conceptions of evolving social mores. "To yield to the impulse to [invalidate legislation merely because members of the court disapprove of its public policy] is to subvert the sensitive interrelationship between the three branches of government which is at the heart of our form of democracy." Vornado, Inc. v. Hyland, 77 N.J. 347, 355, 390 A.2d 606 (1978), appeal dismissed sub. nom., Vornado, Inc. v. Degnan, 439 U.S. 1123, 99 S.Ct. 1037, 59 L.Ed.2d 84 (1979). Consequently, our personal views of the legislative decision to limit the institution of marriage to members of the opposite sex are irrelevant. The only question is whether this legislative decision violates a specific constitutional provision.
Plaintiffs' claim of a constitutional right to recognition of same-sex marriage is based on article I, paragraph 1, of the New Jersey Constitution, which provides:
All persons are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending life and *266 liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness.
Our Supreme Court has held that this paragraph confers state constitutional rights to due process and equal protection of the law. Sojourner A. v. N.J. Dep't of Human Servs., 177 N.J. 318, 332, 828 A.2d 306 (2003); Greenberg v. Kimmelman, 99 N.J. 552, 568, 494 A.2d 294 (1985). Plaintiffs invoke both of these rights in support of their challenge to the limitation of the institution of marriage to members of the opposite sex. We address plaintiffs' due process claim in section I of this opinion and their equal protection claim in section II.

I
Article I, paragraph 1, protects both procedural and substantive due process rights. See Doe v. Poritz, 142 N.J. 1, 99, 662 A.2d 367 (1995); Greenberg, supra, 99 N.J. at 568-69, 494 A.2d 294. The substantive due process rights protected by this provision include the right of privacy. See Sojourner A., supra, 177 N.J. at 332-33, 828 A.2d 306; Greenberg, supra, 99 N.J. at 567-68, 571-72, 494 A.2d 294. This right of privacy "embraces the right to make procreative decisions ... [and] the right of consenting adults to engage in sexual conduct." Greenberg, supra, 99 N.J. at 571-72, 494 A.2d 294 (citations omitted).
Our Supreme Court has held that the due process and privacy protections of article I, paragraph 1, also include the right of members of the opposite sex to marry. Ibid. In fact, the Court has characterized this right as "fundamental." J.B. v. M.B., 170 N.J. 9, 23-24, 783 A.2d 707 (2001); In re Baby M., 109 N.J. 396, 447, 537 A.2d 1227 (1988). However, the Court has never considered whether the New Jersey Constitution confers a right to marry upon members of the same sex.
This court indirectly rejected the view that same-sex couples have a constitutional right to marry in a decision sustaining the validity of provisions of the State Health Plan that denied health benefits to same-sex partners that were extended to spouses of married public employees. Rutgers Council of AAUP Chapters v. Rutgers, 298 N.J.Super. 442, 452-62, 689 A.2d 828 (App.Div.1997), certif. denied, 153 N.J. 48, 707 A.2d 151 (1998). Relying upon decisions in other jurisdictions that have rejected same-sex couples' claims of a constitutional right to marry, we concluded that the determination whether to extend the same benefits to same-sex partners as to spouses involves "political and economic issues to be decided by the elected representatives of the people." Id. at 462, 689 A.2d 828.
Other jurisdictions have expressly rejected constitutional challenges to statutes that limit the institution of marriage to members of the opposite sex. See, e.g., Standhardt v. Superior Court ex rel. Maricopa, 206 Ariz. 276, 77 P.3d 451 (Ct.App.2003), review denied (Ariz.2004); Dean v. Dist. of Columbia, 653 A.2d 307 (D.C.1995); Morrison v. Sadler, 821 N.E.2d 15 (Ind.Ct.App.2005); Jones v. Hallahan, 501 S.W.2d 588 (Ky.Ct.App.1973); Baker v. Nelson, 291 Minn. 310, 191 N.W.2d 185 (1971), appeal dismissed for want of a substantial federal question, 409 U.S. 810, 93 S.Ct. 37, 34 L.Ed.2d 65 (1972); In re Cooper, 187 A.D.2d 128, 592 N.Y.S.2d 797, 799-801, appeal dismissed, 82 N.Y.2d 801, 604 N.Y.S.2d 558, 624 N.E.2d 696 (1993); Singer v. Hara, 11 Wash.App. 247, 522 P.2d 1187, review denied, 84 Wash.2d 1008 (1974). In Singer, the court concluded that the limitation of the institution of marriage to members of the opposite sex "is based upon the state's recognition that *267 our society as a whole views marriage as the appropriate and desirable forum for procreation and the rearing of children," 522 P.2d at 1195, and that "marriage is so clearly related to the public interest in affording a favorable environment for the growth of children that we are unable to say that there is not a rational basis upon which the state may limit the protection of its marriage laws to the legal union of one man and one woman," id. at 1197. Other courts that have rejected challenges to the constitutionality of the limitation of marriage to members of the opposite sex also have relied upon the role that marriage plays in procreation and in providing the optimal environment for child rearing. See Standhardt, supra, 77 P.3d at 461-64; Dean, supra, 653 A.2d at 333; Morrison, supra, 821 N.E.2d at 23-35; Nelson, supra, 191 N.W.2d at 186.
The only state supreme court decision that has declared the limitation of the institution of marriage to members of the opposite sex to be unconstitutional is Goodridge v. Dep't of Pub. Health, 440 Mass. 309, 798 N.E.2d 941 (2003), which is discussed later in this opinion. See also Opinions of the Justices to the Senate, 440 Mass. 1201, 802 N.E.2d 565 (2004). In addition, the Vermont Supreme Court held that denial of the benefits incident to marriage to same-sex domestic partners violated the "common benefits" provision of the Vermont Constitution, but that this constitutional violation could be remedied by enactment of a domestic partnership act or other legislation that extends the benefits that flow from marriage to same-sex couples. Baker v. State, 170 Vt. 194, 744 A.2d 864, 886-87 (1999). The Vermont Legislature subsequently enacted legislation authorizing domestic partnerships to comply with this mandate. Vt. Stat. Ann. tit. 15 §§ 1201-07 (2004). The Hawaii Supreme Court held that the limitation of marriage to members of the opposite sex established a sex-based classification that required strict scrutiny under equal protection analysis, Baehr v. Lewin, 74 Haw. 530, 852 P.2d 44 (1993), and on remand, a trial court declared this limitation to be violative of the Hawaii Constitution, but before the case was brought back before the Hawaii Supreme Court, the electorate approved a constitutional amendment prohibiting same-sex marriage, Haw. Const. art. I, § 23. See William C. Duncan, Whither Marriage in the Law?, 15 Regent L. Rev. 119, 119-20 (2003).[1]
Our Supreme Court has indicated that in determining whether a claimed right is entitled to protection as a matter of substantive due process, a court should "look to `the traditions and [collective] conscience of our people to determine whether a principle is so rooted [there] ... as to be ranked as fundamental.'" King v. S. Jersey Nat'l Bank, 66 N.J. 161, 178, 330 A.2d 1 (1974) (quoting Griswold v. Connecticut, 381 U.S. 479, 493, 85 S.Ct. 1678, 1686, 14 L.Ed.2d 510, 520 (1965) (Goldberg, J., concurring)). Similarly, the Supreme Court of the United States has recently reaffirmed that "the Due Process Clause specially *268 protects those fundamental rights and liberties which are, objectively, `deeply rooted in this Nation's history and tradition,' and `implicit in the concept of ordered liberty,' such that `neither liberty nor justice would exist if they were sacrificed.'" Washington v. Glucksberg, 521 U.S. 702, 720-21, 117 S.Ct. 2258, 2268, 138 L.Ed.2d 772, 787-88 (1997) (citations omitted). The Court noted that confining constitutional protection to "fundamental rights found to be deeply rooted in our legal tradition ... tends to rein in the subjective elements that are necessarily present in due-process judicial review." Id. at 722, 117 S.Ct. at 2268, 138 L.Ed.2d at 788.
Marriage between members of the same sex is clearly not a "fundamental right[] ... deeply rooted in our legal tradition." To the contrary, as we observed in M.T. v. J.T., 140 N.J.Super. 77, 83-84, 355 A.2d 204 (App.Div.), certif. denied, 71 N.J. 345, 364 A.2d 1076 (1976):
[A] lawful marriage requires the performance of a ceremonial marriage of two persons of the opposite sex, a male and a female. Despite winds of change, this understanding of a valid marriage is almost universal....
... The historic assumption in the application of common law and statutory strictures relating to marriages is that only persons who can become `man and wife' have the capacity to enter marriage.
Plaintiffs' claim that a right to marriage between members of the same sex may be found in article I, paragraph 1, of the New Jersey Constitution has no foundation in its text, this Nation's history and traditions or contemporary standards of liberty and justice. It certainly is an idea that would have been alien to the delegates to the 1947 Constitutional Convention who proposed this provision and to the voters who approved it. Although there has been a substantial liberalization of public attitudes towards the rights of homosexuals in the intervening fifty-eight years, there is no current public consensus favoring recognition of marriages between members of the same sex. In fact, in 1996 Congress enacted the Defense of Marriage Act (DOMA), Pub.L. No. 104-199, 110 Stat. 2419, which provides that no State shall be required to give effect under the Full Faith and Credit Clause of the United States Constitution, U.S. Const. art. IV, § 1, to any other state's law that recognizes same-sex marriage, 28 U.S.C.A. § 1738C, and that all Acts of Congress that refer to "marriage" or "spouse" shall be interpreted to apply only to mixed-gender couples, 1 U.S.C.A. § 7. And as previously discussed, our Legislature recently enacted the Domestic Partnership Act, which confers substantial legal rights upon same-sex couples who enter into domestic partnership unions but stops short of recognizing the right of members of the same sex to marry.
Plaintiffs have failed to identify any source in the text of the New Jersey Constitution, the history of the institution of marriage or contemporary social standards for their claim that the Constitution mandates State recognition of marriage between members of the same sex. Plaintiffs describe marriage as simply a "compelling and definitive expression of love and commitment that can occur between two adults"  without any reference to the historical, religious or social foundations of the institution  and argue that because two members of the same sex have the same capacity as members of the opposite sex to "make a strong and meaningful lifetime commitment to each other," the State must extend the same recognition to same-sex marriage as a marriage between members of the opposite sex. However, our society and laws view marriage as something more than just State recognition *269 of a committed relationship between two adults. Our leading religions view marriage as a union of men and women recognized by God, see Larry Catá Backer, Religion as the Language of Discourse of Same Sex Marriage, 30 Cap. U.L. Rev. 221, 234-36 (2002), and our society considers marriage between a man and woman to play a vital role in propagating the species and in providing the ideal environment for raising children.[2] See George W. Dent, Jr., The Defense of Traditional Marriage, 15 J.L. & Pol., 581, 593-601 (1999); William C. Duncan, The State Interests in Marriage, 2 Ave Maria L. Rev. 153, 164-72 (2004); Monte Neil Stewart, Judicial Redefinition of Marriage, 21 Canadian J. Fam. L., 11, 41-85 (2004).
Indeed, the very cases that plaintiffs rely upon for the proposition that there is a fundamental right to marry reflect these common understandings of the religious and social foundations of marriage that limit the institution to members of the opposite sex. For example, in Turner v. Safley, 482 U.S. 78, 96, 107 S.Ct. 2254, 2265, 96 L.Ed.2d 64, 83 (1987), the Court noted that "many religions recognize marriage as having spiritual significance;... and ..., therefore, the commitment of marriage may be an exercise of religious faith as well as an expression of personal dedication." In Zablocki v. Redhail, 434 U.S. 374, 384, 98 S.Ct. 673, 680, 54 L.Ed.2d 618, 629 (1978), the Court "recognized that the right `to marry, establish a home and bring up children' is a central part of the liberty protected by the Due Process Clause," and described marriage "as `fundamental to the very existence and survival of the race.'" (Citations omitted).
The conclusion that marriage between members of the same sex has no historical foundation or contemporary societal acceptance and therefore is not constitutionally mandated is supported by decisions in other jurisdictions that have addressed the issue. In Standhardt, supra, 77 P.3d at 459, the court concluded that "[a]lthough same-sex relationships are more open and have garnered greater societal acceptance in recent years, same-sex marriages are neither deeply rooted in the legal and social history of our Nation or state nor are they implicit in the concept of ordered liberty." Similarly, in Dean, the court concluded that "same-sex marriage is not a `fundamental right' protected by the due process clause, because that kind of relationship *270 is not `deeply rooted in this Nation's history and tradition.'" 653 A.2d at 331 (quoting Moore v. City of E. Cleveland, 431 U.S. 494, 503, 97 S.Ct. 1932, 1938, 52 L.Ed.2d 531, 540 (1977)); see also Nelson, supra, 191 N.W.2d at 186 (noting that "[t]he institution of marriage as a union of man and woman, uniquely involving the procreation and rearing of children within a family, is as old as the book of Genesis.").
Plaintiffs argue that the State's contention that the essence of the institution of marriage is a State-sanctioned union between members of the opposite sex constitutes "circular reasoning,"  a characterization adopted by the dissent in its discussion of decisions in other jurisdictions that have upheld the limitation of the institution of marriage to members of the opposite sex. See infra, 378 N.J.Super. at 204, 875 A.2d at 280-81. However, plaintiffs' argument proceeds along the same kind of circular path that they accuse the State of following. Plaintiffs start with the premise that there is no difference between a "compelling and definitive expression of love and commitment" between members of the same sex and a marriage between members of the opposite sex, and then argue from this premise that the State has failed to carry its burden of justifying the limitation of the institution of marriage to a man and a woman. But the significant difference between these arguments is that the State's argument is grounded on historical tradition and our nation's religious and social values, while plaintiffs' argument is based on nothing more than their own normative claim that society should give unions between same-sex couples the same form of recognition as marriages between members of the opposite sex.
The same form of constitutional attack that plaintiffs mount against statutes limiting the institution of marriage to members of the opposite sex also could be made against statutes prohibiting polygamy. Persons who desire to enter into polygamous marriages undoubtedly view such marriages, just as plaintiffs view same-sex marriages, as "compelling and definitive expression[s] of love and commitment" among the parties to the union. Indeed, there is arguably a stronger foundation for challenging statutes prohibiting polygamy than statutes limiting marriage to members of the opposite sex "because, unlike gay marriage, [polygamy] has been and still is condoned by many religions and societies."[3] Dent, supra, 15 J.L. & Pol. at 628. Nevertheless, courts have uniformly rejected constitutional challenges to statutes prohibiting polygamy on the grounds that polygamous marriage is offensive to our Nation's religious principles and social mores. Reynolds v. United States, 98 U.S. 145, 161-67, 25 L.Ed. 244, 248-51 (1878); Potter v. Murray City, 760 F.2d 1065, 1068-71 (10th Cir.), cert. denied, 474 U.S. 849, 106 S.Ct. 145, 88 L.Ed.2d 120 (1985); see also State v. Green, 99 P.3d 820 (Utah 2004). In Reynolds, the Court stated:
Polygamy has always been odious among the northern and western nations of Europe, and, until the establishment of the Mormon Church, was almost exclusively a feature of the life of Asiatic and African people.... [F]rom the earliest history of England polygamy has been treated as an offence against society.
. . . .

*271 ... In the face of all this evidence, it is impossible to believe that the constitutional guaranty of religious freedom was intended to prohibit legislation in respect to this most important feature of social life.
[98 U.S. at 164-65, 25 L.Ed. at 250.]
More recently, the Tenth Circuit concluded:
Monogamy is inextricably woven into the fabric of our society. It is the bedrock upon which our culture is built. In light of these fundamental values, the State is justified, by a compelling interest, in upholding and enforcing its ban on plural marriage to protect the monogamous marriage relationship.
[Potter, supra, 760 F.2d at 1070 (citation omitted).]
Plaintiffs' only response to the State's comparison of the justification for limitation of the institution of marriage to members of the opposite sex with its limitation to a single man and a single woman is that "[t]hey do not challenge the `binary nature of marriage' and indeed embrace the solemn statutory obligation of `exclusivity.'" However, persons whose religions and cultural traditions condone polygamy, but disapprove of same-sex marriage, could just as easily say that they do not challenge the limitation of marriage to members of the opposite sex, only the requirement that marriage must be binary.
In sum, the right to marry is a fundamental right that is subject to the privacy protections of article I, paragraph 1, of the New Jersey Constitution. However, this right extends only to marriages between members of the opposite sex. Plaintiffs' claim of a constitutional right to State recognition of marriage between members of the same sex has no foundation in the text of the Constitution, this Nation's history and traditions or contemporary standards of liberty and justice. Therefore, we reject plaintiffs' claim under the substantive due process and privacy protections of the New Jersey Constitution.

II
We turn next to plaintiffs' equal protection claim. In determining whether the State has violated the equal protection guarantees of article I, paragraph 1, our courts employ a balancing test that considers "the nature of the affected right, the extent to which the governmental restriction intrudes upon it, and the public need for the restriction." Greenberg, supra, 99 N.J. at 567, 494 A.2d 294. Thus, the "crucial" threshold step in the required constitutional analysis is identification of "the nature of the [claimed] right." Ibid.; see also Poritz, supra, 142 N.J. at 94, 662 A.2d 367.
In the decisions upon which plaintiffs construct their constitutional attack upon the limitation of marriage to members of the opposite sex, it was undisputed that the statute in issue affected a constitutional right. See Sojourner A., supra, 177 N.J. at 333, 828 A.2d 306 ("a woman's right to make procreative decisions"); Greenberg, supra, 99 N.J. at 571-72, 494 A.2d 294 (the right of members of the opposite sex to marry); Right to Choose v. Byrne, 91 N.J. 287, 303-04, 450 A.2d 925 (1982) ("a woman's right to choose whether to carry a pregnancy to full-term or to undergo an abortion"); Planned Parenthood of Cent. N.J. v. Farmer, 165 N.J. 609, 762 A.2d 620 (2000) (same). Consequently, the only question in those cases was "the extent to which the [challenged statute] intrude[d] upon [a recognized constitutional right], and the public need for the restriction." Greenberg, supra, 99 N.J. at 567, 494 A.2d 294.
*272 In contrast, the essential question in this case is whether same-sex couples have any constitutional right to marry. For reasons set forth at length in section I of this opinion, we are satisfied that only members of the opposite sex have a constitutionally protected right to marry. Therefore, plaintiffs have failed to satisfy their threshold burden to show the existence of an "affected right," and for that reason the State is not required to show that the "public need" for restrictions upon that right outweigh plaintiffs' interest in its exercise.[4]
The primary federal decision upon which plaintiffs rely, Loving v. Virginia, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967), rested upon the premise, derived from Skinner v. Oklahoma, 316 U.S. 535, 541, 62 S.Ct. 1110, 1113, 86 L.Ed. 1655, 1660 (1942), that members of the opposite sex have a constitutionally protected right to marry. Proceeding on this premise, the Court invalidated a Virginia statute that prohibited a "white person" from marrying anyone other than another "white person" on the grounds that "restricting the freedom to marry solely because of racial classifications violates the central meaning of the Equal Protection Clause [of the Fourteenth Amendment.]" Loving, supra, 388 U.S. at 12, 87 S.Ct. at 1823, 18 L.Ed.2d at 1018. Noting that "[m]arriage is one of the `basic civil rights of man,' fundamental to our very existence and survival[,]" the Court also held that the statute violated the Due Process Clause. Ibid. (quoting Skinner, supra, 316 U.S. at 541, 62 S.Ct. at 1113, 86 L.Ed. at 1660). However, nothing in Loving suggests that the Fourteenth Amendment prohibits a State from limiting the institution of marriage to a State-recognized union between a man and a woman. In fact, several years after Loving, when the Minnesota Supreme Court rejected a constitutional challenge to that State's prohibition against marriage by members of the same sex in a decision that distinguished Loving on the ground that "there is a clear distinction between a marital restriction based merely upon race and one based upon the fundamental difference in sex," Nelson, supra, 191 N.W.2d at 187, the Supreme Court dismissed an appeal from that decision "for want of a substantial federal question," 409 U.S. 810, 93 S.Ct. 37, 34 L.Ed.2d 65; see also Adams v. Howerton, 673 F.2d 1036, 1039 n. 2 (9th Cir.), cert. denied, 458 U.S. 1111, 102 S.Ct. 3494, 73 L.Ed.2d 1373 (1982). Subsequent Supreme Court decisions also indicate that the constitutionally protected right recognized by the Court is the right of members of the opposite sex to marry. See Turner, supra, 482 U.S. at 95-96, 107 S. Ct. at 2265, 96 L.Ed.2d at 83; Zablocki, supra, 434 U.S. at 383-86, 98 S.Ct. at 679-81, 54 L.Ed.2d at 628-31; see also Standhardt, supra, 77 P.3d at 458 (noting that Loving "was anchored to the concept of marriage as a union involving persons of the opposite sex," and that "[i]n contrast, recognizing a right to marry someone of the same sex would not expand the established right to marry, but would redefine the legal meaning of `marriage.'").
The only opinion by a member of the Court that directly addresses whether the Fourteenth Amendment may be found to compel recognition of a right of same-sex *273 couples to marry is Justice Scalia's opinion in Lawrence v. Texas, 539 U.S. 558, 604-05, 123 S.Ct. 2472, 2497-98, 156 L.Ed.2d 508, 542-43 (2003) (Scalia, J., dissenting). In dissenting from the majority's holding that a Texas statute making it a crime for two persons of the same sex to engage in certain types of intimate sexual conduct violated the Due Process Clause, he stated:
Today's opinion dismantles the structure of constitutional law that has permitted a distinction to be made between heterosexual and homosexual unions, insofar as formal recognition in marriage is concerned.
[539 U.S. at 604, 123 S.Ct. at 2498, 156 L.Ed.2d at 542.]
However, Justice Kennedy's majority opinion rejected this contention, stating:
[This case] does not involve whether the government must give formal recognition to any relationship that homosexual persons seek to enter.
[539 U.S. at 578, 123 S.Ct. at 2484, 156 L.Ed.2d at 525.]
Even more pointedly, Justice O'Connor stated in a concurring opinion that "preserving the traditional institution of marriage" is a "legitimate state interest" and that "other reasons exist to promote the institution of marriage beyond mere moral disapproval of an excluded group." 539 U.S. at 585, 123 S.Ct. at 2487-88, 156 L.Ed.2d at 530. Therefore, there is nothing in Loving or Lawrence that indicates that the Fourteenth Amendment bars a state from prohibiting marriage between members of the same sex, and significantly, plaintiffs have disavowed reliance upon the United States Constitution in their attack upon this State's limitation of marriage to members of the opposite sex.
In the only state supreme court decision that has held the limitation of the institution of marriage to members of the opposite sex to be violative of a state constitution, Goodridge, the court's plurality opinion starts with the premise that marriage is a social institution that reflects "[t]he exclusive commitment of two individuals to each other [that] nurtures love and mutual support[,]" 798 N.E.2d at 948, or as restated later in the opinion, "a deeply personal commitment to another human being and a highly public celebration of the ideals of mutuality, companionship, intimacy, fidelity, and family," id. at 954. The opinion then frames the question in the case as whether the State has demonstrated a sufficient justification for withholding the benefits of marriage, as thus conceived, from same-sex couples. The opinion proceeds to consider the justifications relied upon by the State for limitation of marriage to opposite-sex couples  "(1) providing a `favorable setting for procreation'; (2) ensuring the optimal setting for child rearing, which the department defines as `a two-parent family with one parent of each sex'; and (3) preserving scarce State and private financial resources"  and finds each one to be constitutionally inadequate. Id. at 961-68.
The essential premise of the Goodridge plurality opinion  that the institution of marriage is simply an "exclusive commitment of two individuals to each other," id. at 943  constitutes a normative judgment that conflicts with the traditional and still prevailing religious and societal view of marriage as a union between a man and a woman that plays a vital role in propagating the species and provides the ideal setting for raising children. Consequently, unlike Loving, Goodridge does not establish a right of equal access to marriage, regardless of race or any other invidiously discriminatory factor, but instead significantly alters the nature of this social institution. Indeed, the plurality opinion itself acknowledges that "our decision today *274 marks a significant change in the definition of marriage as it has been inherited from the common law, and understood by many societies for centuries." Id. at 965.
The understanding of the nature of marriage as a State-recognized union between a man and a woman reflects the understanding of the delegates to the 1947 Constitutional Convention who proposed article I, paragraph 1, of our Constitution and the voters who approved it. This constitutional provision does not give a court the license to create a new constitutional right to same-sex marriage simply because its members may feel that the State should grant same-sex couples the same form of recognition as opposite-sex couples who choose to marry. Moreover, to whatever extent it may be appropriate to consider current social mores and values in interpreting the liberty and equality protections of article 1, paragraph 1, there is no basis for concluding that our society now accepts the view that there is no essential difference between a traditional marriage of a man and woman and a marriage between members of the same sex. To the contrary, Congress's enactment in 1996 of the Defense of Marriage Act, the New Jersey Legislature's recent enactment of the Domestic Partnership Act, which confers substantial legal rights upon same-sex couples but stops short of recognizing the right of members of the same sex to marry, and the strongly negative public reactions to the decisions in Goodridge and in lower courts of other states that have held the limitation of the institution of marriage to members of the opposite sex to be unconstitutional, demonstrate that there is not yet any public consensus favoring recognition of same-sex marriage. Therefore, we reject plaintiffs' claim that the New Jersey Constitution requires extension of the institution of marriage to same-sex couples.
Although same-sex couples do not have a constitutional right to marry, they have significant other legal rights. Same-sex couples may seek to adopt children together, see In re Application for Change of Name by Bacharach, 344 N.J.Super. 126, 134, 780 A.2d 579 (App.Div.2001); their right to engage in sexual relations is protected by both the United States and New Jersey Constitutions, see Lawrence, supra, 539 U.S. at 578, 123 S.Ct. at 2484, 156 L.Ed.2d at 525-26; Greenberg, supra, 99 N.J. at 571-72, 494 A.2d 294; State v. Saunders, 75 N.J. 200, 214, 381 A.2d 333 (1977); and they may enter into domestic partnership unions under the Domestic Partnership Act that entitle them to many of the same legal benefits enjoyed by married opposite-sex couples. Moreover, domestic partners may assert claims that the due process and equal protection guarantees of article 1, paragraph 1, of the New Jersey Constitution entitle them to additional legal benefits provided by marriage. See Baker v. State, supra, 744 A.2d at 869-86.
A time may come when our society accepts the view that same-sex couples should be allowed to marry. If there were such an evolution in public attitudes, our Legislature presumably would amend the marriage laws to recognize same-sex marriage just as it recognized the increasing public acceptance of same-sex unions by enacting the Domestic Partnership Act. However, absent legislative action, there is no basis for construing the New Jersey Constitution to compel the State to authorize marriages between members of the same sex.
Affirmed.
PARRILLO, J.A.D., concurring.
I join in the majority decision essentially for the reasons so clearly expressed by Judge Skillman. I write separately to underscore *275 the nature of the right being asserted, the continuing viability of the State's interest in preserving its originating force, and the proper divide between judicial and legislative activity in a matter of such profound social significance.
Plaintiffs challenge New Jersey's marriage laws, N.J.S.A. 37:1-1 to -27, solely on state constitutional grounds because they implicitly recognize there is no federally protected right of same-sex couples to marry. So limited, their argument posits a right that is really twofold: the right to marry and the rights of marriage. Plaintiffs want the former, in part, because it bestows the latter, and because if the latter are fundamental, the former must be as well. Although the rhetoric of justification tends to collapse the nature of the rights in question, they are, upon closer examination, quite separate and not at all the same.
The rights of marriage  the so-called secular implications  are actually not contained in the marriage laws under attack, which simply delineate which persons may not marry each other, see, e.g., N.J.S.A. 37:1-1, but rather are conferred by a host of statutes not here in issue. Unquestionably, the economic, legal and regulatory benefits incident to a marriage license are significant. But, as Judge Skillman's opinion points out, many of these rights and protections are afforded to committed same-sex couples under our Domestic Partnership Act, N.J.S.A. 26:8A-1 to -12, as well as evolving case law that recognizes, among other privileges, the right of same-sex couples to seek to adopt children together. See In re Application for a Change of Name by Bacharach, 344 N.J.Super. 126, 134, 780 A.2d 579 (App.Div.2001) (citing In re Adoption of Two Children by H.N.R., 285 N.J.Super. 1, 6, 666 A.2d 535 (App.Div.1995)). Of course, to the extent those laws unconstitutionally withhold any of the publicly-conferred tangible or intangible benefits of marriage from same-sex couples, plaintiffs remain free to redress any such deprivation on an ad-hoc basis, by challenging the particular statutory exclusion resulting in disparate or unfair treatment. In fact, it would seem a much more effective approach to address the claimed denial directly, rather than to simply advance the notion as an additional basis for finding a constitutional mandate for state recognition of same-sex marriage.
The latter's symbolic significance, however, lies at the heart of plaintiffs' argument. Although New Jersey's Domestic Partnership law affords plaintiffs a legally-recognized status more or less "marriage-like," it does not carry the title "marriage." This is, by no means, to suggest the legal conflict is merely semantic or not as rationally important to the people on each side of the issue. On the contrary, definitions matter. This is why the conflict over the core meaning and purpose of marriage is so highly charged. Indeed, notwithstanding equal benefits and protections under our law, plaintiffs would still argue that denial of the right to marry operates per se to deny a constitutionally protected right; that the right to marry, under New Jersey's constitution, compels state sanctioning of same-sex marriage. Resolution of this issue, therefore, requires an understanding of the precise status in issue.
Plaintiffs' claim of a right to marry relies on traditional equality and liberty jurisprudence, the latter couched in the more recent terminology of privacy, autonomy, and identity. No doubt, plaintiffs have taken their bearings from the "close personal relationship" model of marriage espoused in Goodridge v. Department of Public Health, 440 Mass. 309, 798 N.E.2d 941 (2003). Citing "respect for individual autonomy," id. at 949, the Goodridge plurality *276 defined marriage simply as "the exclusive and permanent commitment of the married partners to one another[]," id. at 961; "the voluntary union of two persons as spouses, to the exclusion of all others[]," id. at 969; and "at once a deeply personal commitment to another human being and a highly public celebration of ideals of mutuality, companionship, intimacy, fidelity, and family." Id. at 954. Given this narrow view, it is no wonder the Goodridge plurality concluded that "our laws of civil marriage do not privilege procreative heterosexual intercourse between married people above every other form of adult intimacy and every other means of creating a family." Id. at 961.
This distillation of marriage down to its pure "close personal relationship" essence, however, strips the social institution "of any goal or end beyond the intrinsic emotional, psychological, or sexual satisfaction which the relationship brings to the individuals involved." Monte Neil Stewart, Judicial Redefinition of Marriage, 21 Can. J. Fam. L. 11, 81 (2004) (quoting D. Cere, "The Conjugal Tradition in Post Modernity: The Closure of Public Discourse?" at 6 (2003) (unpublished)). Yet, the marital form traditionally has embraced so much more, including:
the fundamental facets of [traditional] conjugal life: the fact of sexual difference; the enormous tide of heterosexual desire in human life, the massive significance of male female bonding in human life; the procreativity of heterosexual bonding, the unique social ecology of heterosexual parenting which bonds children to their biological parents, and the rich genealogical nature of heterosexual family ties.
[Ibid. (citation omitted.)].
The simple fact is that the very existence of marriage does "privilege procreative heterosexual intercourse." Marriage, plainly speaking, is a privileged state and that is precisely why plaintiffs are waging this battle. Procreative heterosexual intercourse is and has been historically through all times and cultures an important feature of that privileged status, and that characteristic is a fundamental, originating reason why the State privileges marriage. Skinner v. Oklahoma, 316 U.S. 535, 541, 62 S.Ct. 1110, 1113, 86 L.Ed. 1655 (1942); J.B. v. M.B., 170 N.J. 9, 23, 783 A.2d 707 (2001); Lindquist v. Lindquist, 130 N.J.Eq. 11, 19, 20 A.2d 325 (E. & A.1941); see also Dean v. District of Columbia, 653 A.2d 307, 337 (D.C.1995). When plaintiffs, in defense of genderless marriage, argue that the State imposes no obligation on married couples to procreate, they sorely miss the point. Marriage's vital purpose is not to mandate procreation but to control or ameliorate its consequences  the so-called "private welfare" purpose. To maintain otherwise is to ignore procreation's centrality to marriage.
By seeking public recognition and affirmation of their private relationships, plaintiffs acknowledge that marriage is more than a merely private declaration, but an act of public significance and consequence for which the State exerts an important regulatory role.[1] Indeed, to seek such official assent is to concede the authority of those whose regard is sought.
*277 Because marriage has secular implications  the so-called "rights of marriage"  the State has a legitimate interest in determining eligibility criteria. In fact, no one really disputes that the State is empowered to privilege marriage by restricting access to, or drawing principled boundaries around, it. Greenberg v. Kimmelman, 99 N.J. 552, 572, 494 A.2d 294 (1985). Indeed, there are reasons for limiting unfettered access to marriage. Otherwise, by allowing the multiplicity of human choices that bear no resemblance to marriage to qualify, the institution would become non-recognizable and unable to perform its vital function. Thus, New Jersey statutes ban bigamous marriages, N.J.S.A. 2C:24-1, common law marriages, N.J.S.A. 37:1-10, incestuous marriages, N.J.S.A. 37:1-1, and marriages to persons adjudged to be mentally incompetent or with a venereal disease in a communicable stage, N.J.S.A. 37:1-9. The governmental interest in these restrictions has been repeatedly and widely recognized.
To be sure, longstanding traditions restricting the right to marry are not immune from constitutional challenge. Yet, plaintiffs' reliance on Loving v. Virginia, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967), does not advance this proposition. Anti-miscegenation laws simply may not be equated with laws reserving marriage to opposite-sex couples. Marriage has an inherent nature, and race is not intrinsic to that status. The so-called "tradition" of laws prohibiting interracial marriages "was contradicted by a text  an Equal Protection Clause that implicitly establishes racial equality as a constitutional value." Planned Parenthood v. Casey, 505 U.S. 833, 980, n. 1, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) (Scalia, J., dissenting in part).
In contradistinction, a core feature of marriage is its binary, opposite-sex nature. Interestingly, plaintiffs admittedly have no quarrel with the legal requirement that marriage be limited to a union of two people. But, the binary idea of marriage arose precisely because there are two sexes. Plaintiffs simply have not posited an alternative theory of marriage that would include members of the same sex, but still limit the arrangement to couples, or that would otherwise justify the distinction. If, however, the meaning of marriage and the right to marital status is sufficiently defined without reference to gender, then what principled objection could there be to removing its binary barrier as well? If, for instance, marriage were only defined with reference to emotional or financial interdependence, couched only in terms of privacy, intimacy, and autonomy, then what non-arbitrary ground is there for denying the benefit to polygamous or endogamous unions whose members claim the arrangement is necessary for their self-fulfillment?
The legal nature of marriage cannot be totally malleable lest the durability and viability of this fundamental social institution be seriously compromised, if not entirely destabilized. Because the reasons for the existence of marriage retain substantial vitality to date, because the "specialness" of its opposite-sex feature makes it meaningful and achieves important public purposes, and because the meaning and value of alternative theories are speculative and unknown, the State's interest in maintaining the traditional gender block is rationally based.
It may well be, as some posit, that marriage "is socially constructed, and thus transformable[.]" Evan Wolfson, Crossing the Threshold: Equal Marriage Rights for Lesbians and Gay Men and the Intra-Community Critique, 21 N.Y.U. Rev. of L. & Soc. Change, 567, 589 (1994). Perhaps so. And it would be foolish not to recognize a certain dynamism in the evolving *278 view of marriage and its role in society. Indeed, the basic reality of procreative capacity in right to marry cases to date may, in the future, take on different meaning or significance given the displacing potential of cross-cultural forces in our society, such as contraception and assisted reproductive technology. Suffice it to say, however, there is no plausible basis for suggesting the link is now so weak as to require the line be drawn any differently. Nothing before the court compels us to remove the "deep logic" of gender as a necessary component of marriage, or to recognize, on equal footing, any adult relationship characterized merely by interdependence, mutuality, intimacy, and endurance.
Any societal judgment to level the playing field must appreciate the proper divide between judicial and legislative activity. "[L]aw has a purpose and a power to preserve or change public meanings and thus a purpose and a power to preserve or change social institutions." Stewart, supra, at 80. In this vein, it is the Legislature's prerogative to define and advance governmental ends, while the judiciary ensures the means selected bear a just and reasonable relationship to the governmental objective, or, in the case of suspect classifications or fundamental rights, are supported by compelling State interests. It is, therefore, a proper role for the Legislature to weigh the societal costs against the societal benefits flowing from a profound change in the public meaning of marriage. On the other hand, the judiciary is not in the business of preferring, much less anointing, one value as more valid than another, particularly where, at least in the foreseeable future, the conflict is not susceptible to resolution by scientific or objective means. The choice must come from democratic persuasion, not judicial fiat.
COLLESTER, J.A.D., dissenting.
Although my colleagues and I arrive at a different conclusion, we are in agreement that any individual views we have on the morality or social implications of same-sex marriage must play no part in our analysis of the constitutional issues presented. In the ongoing public debate there are persons of intelligence, sensitivity and good will on each side of the issue. Some believe that lawful marriage between persons of the same gender would undermine the essential nature of both marriage and family life. Others argue that it would give proper recognition to committed same-sex relationships and by doing so enhance marriage. Our function as judges is to interpret the Constitution, not rewrite it, and our interpretation must be principled rather than skewed to fit an individual philosophy or a desired result. N.J. Sports Authority v. McCrane, 61 N.J. 1, 8, 292 A.2d 545 (1972). Nonetheless, we must interpret our Constitution to uphold individual rights, liberties and guarantees for all citizens even though our conclusion may disappoint or offend some earnest and thoughtful citizens.
For all of its personal, familial and spiritual value, marriage is a creature of State laws governing its entrance, protecting its special status, and, when necessary, specifying the terms of its dissolution. Marriage is also a fundamental civil right protected by both the Federal and New Jersey Constitutions. Zablocki v. Redhail, 434 U.S. 374, 383, 98 S.Ct. 673, 680, 54 L.Ed.2d 618 (1978); J.B. v. M.B., 170 N.J. 9, 23-24, 783 A.2d 707 (2001). Laws may not "interfere directly and substantially with the right to marry." Zablocki, supra, 434 U.S. at 387, 98 S.Ct. at 681, 54 L.Ed.2d at 631.
The right to marry is effectively meaningless unless it includes the freedom to *279 marry a person of one's choice. Goodridge v. Dep't of Pub. Health, 440 Mass. 309, 798 N.E.2d 941, 958 (2003); see also, Perez v. Lippold, 32 Cal.2d 711, 198 P.2d 17, 21 (1948). In Loving v. Virginia, 388 U.S. 1, 12-13, 87 S.Ct. 1817, 1823-24, 18 L.Ed.2d 1010, 1018 (1967), the United States Supreme Court struck down laws prohibiting interracial marriage under both the Due Process and Equal Protection Clauses of the Federal Constitution. Zablocki, supra, 434 U.S. at 392, 98 S.Ct. at 685, 54 L.Ed.2d at 635, invalidated a Wisconsin law requiring a person under a child support order to meet financial requirements and seek court approval in order to marry. Prison inmates cannot be foreclosed from marrying a person of their choosing, who is either inside or outside the institution. Turner v. Safley, 482 U.S. 78, 94, 107 S.Ct. 2254, 2265, 96 L.Ed.2d 64, 83 (1987); see also, Vazquez v. Dep't of Corrections, 348 N.J.Super. 70, 76, 791 A.2d 281 (App.Div.2002) (holding the denial of a request by an inmate serving a life sentence violated her constitutional right to marry).
Statutory restrictions on the right to marry are few, and they are grounded in the State's proper regulatory authority, commonly called its police power, to protect general health, safety and welfare. Marriage is prohibited to a child, a close relative, a mental incompetent or a person afflicted with a venereal disease in a communicable stage. See, N.J.S.A. 37:1-1 to -9. None of the plaintiffs in this case fall within these proscribed categories, and neither the State nor the majority opinion suggest a reason of health, safety or general welfare to justify a prohibition of their right to marry the person of their choosing.
While New Jersey statutes do not specifically limit marriage to a union of a man and a woman or expressly prevent a person from marrying someone of the same sex, it is clear that they do so. M.T. v. J.T., 140 N.J.Super. 77, 83-84, 355 A.2d 204 (App.Div.), certif. denied, 71 N.J. 345, 364 A.2d 1076 (1976). Plaintiffs argue that this prohibition deprives them of their fundamental right to marry a person of their choosing in contravention of their rights of liberty, privacy and equal protection of laws, guaranteed by the New Jersey Constitution. See, Sojourner A. v. Dep't of Human Services, 177 N.J. 318, 332, 828 A.2d 306 (2003); Greenberg v. Kimmelman, 99 N.J. 552, 568, 494 A.2d 294 (1995); In re Quinlan, 70 N.J. 10, 39-40, 355 A.2d 647 (1976).
Plaintiffs are diverse in background and occupation and have lived in committed relationships for decades. Chris Lodewycks and Craig Hutchinson have been together for thirty-four years. Chris is an investment asset manager, president of the Summit Business Association and a trustee of his local YMCA. Mark Lewis and Dennis Winslow are Episcopal priests whose pastoral duties have included officiating at hundreds of weddings and assisting congregants with marriage counseling. Mark is the chaplain for the Secaucus fire and police departments and a trustee of Christ Hospital in Jersey City. Another ordained minister, Alice Troy, is midway through the second decade in her relationship with Sandra Heath.
The other plaintiffs are raising children. The relationship of Cindy Meneghin and Maureen Kilian spans thirty years and they each gave birth following artificial insemination and adopted the other's child. As parents of a twelve year old boy and an eleven year old girl, they attend PTA meetings, coach soccer and are very involved in the lives of their children. Cindy is Director of Web Services at Montclair State University, and Maureen is a church administrator.
*280 Karen Nicholson-McFadden and Marcye Nicholson-McFadden also gave birth to their children, a boy now six and a girl now two, following artificial insemination and cross-adoption. Karen and Marcye have been partners for sixteen years and operate an executive search firm. Karen is a member of the local zoning board of adjustment.
Sarah Lael and her partner, Suyin Lael, adopted their eight year old daughter and at last report were in the process of adopting two other children under the age of five. Marilyn Amneely gave birth to five children during an eighteen year marriage and retained their custody following her divorce. Marilyn's relationship with plaintiff Diane Marini began fourteen years ago, and since that time, Diane has participated in the lives of Marilyn's children as a step-parent. Diane owns two businesses and is a member of the Haddenfield planning board, while Marilyn is a registered nurse at Thomas Jefferson University Hospital in Philadelphia. Together they survived a health crisis after Diane was diagnosed with breast cancer in 1999.
My colleagues and I agree as to the fundamental nature of the right to marry, but they reject plaintiffs' constitutional claims by defining marriage strictly as heterosexual unions. By this definition, plaintiffs are not deprived of the right to marry as long as it is to a member of the opposite sex. But since they cannot marry the person of their choice, it is really no right at all. By so defining marriage, the majority views plaintiffs' assertion of a right to marry as a claim of a different kind of right or to a different kind of marriage, which is beyond judicial authority to recognize as lawful. This analysis mirrors decisions in other jurisdictions which have summarily rejected similar constitutional claims based on other State constitutions. See, e.g., Standhardt v. Superior Court ex rel. County of Maricopa, 206 Ariz. 276, 77 P.3d 451 (Ct.App.2003), review denied (Ariz.2004); Baker v. Nelson, 291 Minn. 310, 191 N.W.2d 185, 186 (1971), appeal dismissed, 409 U.S. 810, 93 S.Ct. 37, 34 L.Ed.2d 65 (1972). But see, Goodridge v. Dep't of Pub. Health, supra, 798 N.E.2d at 949.
The argument is circular: plaintiffs cannot marry because by definition they cannot marry. But it has the advantage of simplicity. If marriage by definition excludes plaintiffs from marrying persons of their choosing, then, unlike all others, they have no fundamental or constitutionally protected right and must seek creation of that right through the political process and a legislative redefinition of marriage. Therefore, opposite-sex marriage is a tautology. Same-sex marriage, an oxymoron. We need go no further. Case closed.
I disagree with both the analysis and the result. To cabin the right to marry within a definition of marriage which prohibits plaintiffs from even asserting a constitutional claim for entitlement to marry the person of their choosing robs them of constitutional protections and deprives them of the same rights of marriage enjoyed by the other individuals of this State, even those confined in State prisons.
After recasting the issue as to whether plaintiffs' claim fits within the restricted definition of marriage, not surprisingly the majority finds no support for marriage between same-sex persons that is "deeply rooted in this Nation's history and tradition" or "implicit in the concept of ordered liberty," and thereby declares that plaintiffs have no fundamental right of marriage.
The analysis is reminiscent of arguments in support of anti-miscegenation laws before Loving. Those laws defined marriage as the union of a man and woman of the same race, and proponents presented *281 a long history in support of the definition.[1] Indeed, in Loving the State of Virginia argued that there was no fundamental right to interracial marriage because "the historic tradition of marriage" did not contemplate such marriages. In rejecting the argument, the Supreme Court framed the issue not as a claim of right to interracial marriage but rather as an assertion of a fundamental right to marriage. Loving, supra, 388 U.S. at 12, 87 S.Ct. at 1823-24, 18 L.Ed.2d at 1018 (1967). The Court declared that the right to marry was one of the "basic civil rights of man" and could not be restricted or prohibited by racial classification. Loving, supra, 388 U.S. at 12, 87 S.Ct. at 1824, 18 L.Ed.2d at 1018, quoting Skinner v. State of Oklahoma, 316 U.S. 535, 541, 62 S.Ct. 1110, 1113, 86 L.Ed. 1655, 1660 (1942). Therefore, while Loving rejected a prohibition of marriage based on race, the analysis is relevant to the instant case because Loving also rejected a definition of marriage foreclosing an individual's right to marry a person of one's choosing and addressed the issue of the constitutional viability of the restriction in terms of the fundamental right to marriage itself rather than to a separate right or different form of marriage.
The majority grounds its definition of marriage excluding persons of the same sex upon historic or religious tradition as well as the societal value attached to procreation. In my view, the first reason is unpersuasive, the second, irrelevant.
With respect to religious beliefs and traditions, it is clear that no matter how marriage is defined, the marriage ceremony has spiritual significance to most, and many consider it a sacrament or exercise of religious faith. Turner v. Safley, 482 U.S. 78, 96, 107 S.Ct. 2254, 2265, 96 L.Ed.2d 64, 83 (1987). To a great number of people, same-sex marriage is contrary to religious faith and teachings. Their objections must be respected, not demeaned. But it is slippery constitutional footing to base a definition of marriage on religious tradition, and, more to the point, plaintiffs seek access only to civil marriage. None of them, not even the three ordained clergy, maintain that same-sex marriage is supported by religious doctrine or tradition, and in this action they do not seek acceptance or recognition within a particular religious community. What they do say is that the spiritual dimension of marriage is unjustly denied to them by civil laws prohibiting them from marrying the person of their choice.
History should be considered a guide, not a harness, to recognition of constitutional rights, and patterns of the past cannot justify contemporary violations of constitutional guarantees. As Justice Holmes famously declared over a century ago,
[i]t is revolting to have no better reason for a rule of law then that so it was laid down in the name of Henry IV. It is more revolting if [its foundation has] vanished long since, and the rule simply persists from blind imitation of the past.
[Justice Oliver Wendell Holmes, The Path of the Law, 10 Harv. L. Rev. 457, 469 (1897).]
That said, it would be folly to challenge that the common historic and legal conception of marriage is as a heterosexual institution.[2] *282 Moreover, I fully agree with the majority that the idea of marriage between persons of the same sex would have been alien both to those who drafted and those who ratified the New Jersey Constitution of 1947. But so were spaceships, computers and reproductive technology. A constitutional right of privacy was not recognized by the United States Supreme Court until 1965 in Griswold v. Connecticut, 381 U.S. 479, 484-85, 85 S.Ct. 1678, 1681, 14 L.Ed.2d 510, 514-15 (1965), and it was almost a decade later when our Supreme Court discerned that right in Article I, paragraph 1 of our Constitution. In re Quinlan, supra, 70 N.J. at 39-40, 355 A.2d 647. It is also farfetched to assume that the framers of the Constitution envisioned a constitutional right for a woman to choose to have an abortion since at that time abortion was a crime which was vigorously prosecuted. State v. Moretti, 52 N.J. 182, 244 A.2d 499 (1968), cert. denied, 393 U.S. 952, 89 S.Ct. 376, 21 L.Ed.2d 363 (1968); State v. Raymond, 113 N.J.Super. 222, 227, 273 A.2d 399 (App.Div.1971).
Certainly, marriage was not perceived as a partnership to the extent that it is today. The common law concept of marriage as a unity was still prevalent. Interspousal immunity from civil suit, then considered fundamental to marriage, was not rejected until decades later. Immer v. Risko, 56 N.J. 482, 488, 267 A.2d 481 (1970); Merenoff v. Merenoff, 76 N.J. 535, 557, 388 A.2d 951 (1978). The unity of marriage precluded spouses from being co-conspirators until the 1970s. See, State v. Pittman, 124 N.J.Super. 334, 336, 306 A.2d 500 (Law Div.1973). A more egregious example was the marriage defense to rape, whereby a husband could avoid prosecution because marriage was a unity and consent by the wife to sexual intercourse was implied. See, State v. Smith, 85 N.J. 193, 426 A.2d 38 (1981).
By far the greatest changes in marriage as it has evolved from its common law unity to a partnership were in terms of its dissolution. Equitable distribution of property acquired during marriage, rehabilitative alimony, child support guidelines and joint custody are just some of the issues which judges routinely consider, but they were outside the scope of divorce litigation law a generation past. Indeed, divorce was relatively uncommon when our State Constitution was adopted. Current estimates are that up to fifty percent of marriages end in divorce, most of which are granted on no-fault grounds, which did not exist in 1947. The dynamics within marriage have also undergone great changes. Married couples, with or without children, are commonly both employed. Single parent households have multiplied as divorce rates have climbed, and adoptions are now more readily available to unmarried persons, including same-sex couples. Rather than a static concept, marriage has been described as an "evolving paradigm," Goodridge, supra, 798 N.E.2d at 966-67, and another paradigm, that of the nuclear family, has also undergone vast changes. See, V.C. v. M.J.B., 163 N.J. 200, 232-34, 748 A.2d 539 (2000) (Long, J., concurring).
While public debate on same-sex marriage is polarized, there should be agreement as to the greater acceptance of gay and lesbian relationships in popular culture and as individuals living in the communities of our State. The 2000 census reported that at least 16,000 same-sex couples reside in New Jersey, a figure considered markedly conservative. Ruth Padawer, *283 Census 2000: Gay Couples, At Long Last, Feel Acknowledged, The Record, August 15, 2001. In its amicus curiae brief, the City of Asbury Park contends in support of plaintiffs' position that the right of same-sex marriage would assist in building stronger communities in the State.
There have been significant alterations to the legal landscape in the past decades since the 1947 Constitution respecting claims of right by gays and lesbians in both constitutional adjudications and domestic relations cases. Most notably is Lawrence v. Texas, 539 U.S. 558, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003) in which the United States Supreme Court specifically overruled Bowers v. Hardwick, 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986), its precedent of less than twenty years earlier, and held that the criminalization of intimate sexual contact between adult homosexuals in private impinged upon their liberty interests protected by the Due Process Clause of the Fourteenth Amendment. Lawrence, supra, 539 U.S. at 578, 123 S.Ct. at 2484, 156 L.Ed.2d at 525. In disclaiming the historical rationale of Bowers, the Lawrence majority opinion by Justice Kennedy quoted language applicable to the case at bar from Justice Stevens' Bowers dissent:
"Our prior cases make two propositions abundantly clear. First, the fact that the governing majority in a State has traditionally viewed a particular practice as immoral is not a sufficient reason for upholding a law prohibiting the practice; neither history nor tradition could save a law prohibiting miscegenation from constitutional attack. Second, individual decisions by married persons, concerning the intimacies of their physical relationship, even when not intended to produce offspring, are a form of `liberty' protected by the Due Process Clause of the Fourteenth Amendment. Moreover, this protection extends to intimate choices by unmarried as well as married persons."
[Lawrence, supra, 539 U.S. at 577-78, 123 S.Ct. at 2483, 156 L. Ed.2d at 525 (quoting Bowers v. Hardwick, supra, 478 U.S. at 216, 106 S.Ct. at 2858, 92 L. Ed.2d at 162). (Stevens, J., dissenting.)]
Judicial decisions of this State have enhanced the rights of gays and lesbians in matters of family law. As witnessed by the Lael family, sexual orientation is not a bar to adoption. Adoption of Two Children by H.N.R., 285 N.J.Super. 1, 11, 666 A.2d 535 (App.Div.1995); Matter of Adoption of Child by J.M.G., 267 N.J.Super. 622, 631-32, 632 A.2d 550 (Ch.Div.1993); see also, In re Application for Change of Name by Bacharach, 344 N.J.Super. 126, 134, 780 A.2d 579 (App.Div.2001). Similarly, the custody and visitation rights of natural or psychological parents cannot be denied or abridged based on sexual orientation. V.C., supra, 163 N.J. at 230, 748 A.2d 539; M.P. v. S.P., 169 N.J.Super. 425, 439, 404 A.2d 1256 (App.Div.1979); In re J.S. & C., 129 N.J.Super. 486, 489, 324 A.2d 90 (Ch.Div.1974), aff'd, 142 N.J.Super. 499, 362 A.2d 54 (App.Div.1976). Moreover, a same-sex partner may lawfully change a surname to match that of his or her partner. Bacharach, supra, 344 N.J.Super. at 134, 780 A.2d 579.
The enhancement of rights in family law for gays and lesbians is representative of a more functional view of family than when our Constitution was adopted. See, e.g., Braschi v. Stahl Assoc., 74 N.Y.2d 201, 544 N.Y.S.2d 784, 543 N.E.2d 49, 54 (1989) (holding that for purposes of the New York rent control laws, a surviving homosexual could not be evicted after his long-term partner died because in "the reality of family life" he qualified as a spouse or member of the immediate family). See generally, Martha Minow, The Free Exercise *284 of Families, 1991 U. Ill. L. Rev. 925, 931-32 (1991); Note, Looking For a Family Resemblance, 104 Harv. L. Rev. 1640 (1991); Barbara J. Cox, Love Makes a Family  Nothing More, Nothing Less: How the Judicial System Has Refused to Protect Nonlegal Parents in Alternative Families, 8 J.L. & Pol., 5 (1991).
Our Supreme Court explored the dimensions and functional reality of "family" in V.C., supra, 163 N.J. at 227-28, 748 A.2d 539, in which it held that a former same-sex partner had standing as a psychological parent to seek legal custody and visitation of twins born to her former partner following artificial insemination. In her separate concurring opinion, Justice Long gave substance to the functional view of family, stating:
[W]e should not be misled into thinking that any particular model of family life is the only one that embodies "family values." Those qualities of family life on which society places a premium  its stability, the love and affection shared by its members, their focus on each other, the emotional and physical care and nurturance that parents provide their offspring, the creation of a safe harbor for all involved, the wellspring of support family life provides its members, the ideal of absolute fealty in good and bad times that infuses the familial relationship (all of which justify isolation from outside intrusion)  are merely characteristics of family life that, except for its communal aspect, are unrelated to the particular form a family takes.
[Id. at 232, 748 A.2d 539.]
The "winds of change" in the traditional understanding of family and marriage which we noted almost thirty years ago in M.T. v. J.T., 140 N.J.Super. 77, 83-84, 355 A.2d 204 (App.Div.), certif. denied, 71 N.J. 345, 364 A.2d 1076 (1976), have been felt by the Legislature, which enacted the Domestic Partnership Act, L. 2003, c. 246, while this appeal was pending. The Act confers some but not all state legal rights afforded married persons to those who qualify and register as domestic partners. N.J.S.A. 26:8A-1 to -12.[3]
Therefore, while conclusions drawn from the past admittedly depend to a degree on where one focuses the telescope, history since 1947 points to changes in the reality of marriage and family life as well as greater acceptance of committed same-sex relationships. I see no basis in the history of marriage to justify a definition which denies plaintiffs the right to enter into lawful marriage in this State with the person of their choice.
Although the Attorney General disclaims the promotion of procreation as a rationale for prohibiting same-sex marriage, the majority does give it weight, stating that "our society considers marriage between a man and woman to play a vital role in propagating the species and in providing the ideal environment for raising children." I agree with the Attorney General. Procreation is irrelevant to the issue before us.
Promotion of procreation as a factor defining marriage to exclude same-sex applicants is relied upon in those cases cited by the majority which recognize that history or tradition cannot alone justify its restrictive *285 definition of marriage or distinguish it from the argument based on history which was rejected by the Supreme Court in Loving. See, e.g., Baker v. Nelson, 291 Minn. 310, 191 N.W.2d 185, 186-87 (1971) ("procreation and the rearing of children within a family" provides "a clear distinction between a marital distinction based merely on race and one based on the fundamental difference in sex."). See generally, William H. Hohengarten, Same-Sex Marriage and the Right of Privacy, 103 Yale L.J. 1495, 1513-23 (1994).
However, there is not, nor could there be, a threshold requirement to marriage of the intention or ability to procreate. See, M.T., supra, 140 N.J.Super. at 83-84, 355 A.2d 204. Of course many heterosexuals marry for reasons unrelated to having children. Some never intend to do so. Some are unable to do so by reason of physical inability, age or health. Moreover, tying the essence of marriage to procreation runs into cases upholding as a right of privacy the election not to procreate. See, Griswold, supra, 381 U.S. at 485, 85 S.Ct. at 1682, 14 L.Ed.2d at 515 (protecting the right of married persons to use contraceptives); Eisenstadt v. Baird, 405 U.S. 438, 454-55, 92 S.Ct. 1029, 1039, 31 L.Ed.2d 349, 363 (1972) (extending the same rights to persons who are not married), Roe v. Wade, 410 U.S. 113, 153, 93 S.Ct. 705, 727, 35 L.Ed.2d 147, 177 (1972) (upholding a woman's right to choose an abortion). See also, Right to Choose v. Byrne, 91 N.J. 287, 305-06, 450 A.2d 925 (1982).
Also if procreation or the ability to procreate is central to marriage, logic dictates that the inability to procreate would constitute grounds for its termination. However, as opposed to the inability or unwillingness to engage in sexual intercourse, the inability or refusal to procreate is not a legal basis for divorce or annulment. See, e.g., T. v. M., 100 N.J.Super. 530, 538, 242 A.2d 670 (Ch.Div.1968). Finally, the claim that the promotion of procreation is a vital element of marriage and justifies exclusion of persons of the same gender falls on its face when confronted with reproductive science and technology. The fact is some persons in committed same-sex relationships can and do legally and functionally procreate. Cindy Meneghin, Maureen Kilian, Karen Nicholson-McFadden and Marcye Nicholson-McFadden, all plaintiffs in this case, each gave birth to their children following artificial insemination.
Moreover, the majority mentions the conventional wisdom of "the role that marriage plays in procreation and providing the optimal environment for child rearing," but no authority is given to justify this "optimal" status. This presents simply as an article of faith and one which ignores the reality of present family life parenting, which includes adoption, step-parenting and the myriad of other relationships of parenting noted by our Supreme Court in V.C. Further, the argument that opposite-sex persons provide a more suitable environment for raising children because they are married simply underscores that plaintiffs and their children are unjustly treated by denying them a right to marry their committed partners. Finally, there is nothing in the record to indicate that the eight plaintiffs in this case currently raising or having raised children as natural parents, adoptive parents or step-parents, are providing an environment for growth and happiness of the children that is anything less than optimal.
Two New Jersey cases are cited by the majority in support of its position. The first, Rutgers Council of AAUP Chapters v. Rutgers, 298 N.J.Super. 442, 689 A.2d 828 (App.Div.1997), certif. denied, 153 N.J. 48, 707 A.2d 151 (1998), bears only indirectly. There we declined to interpret the term "dependents" to include domestic *286 partners for purposes of coverage in the State Health Benefits Plan, id. at 452, 689 A.2d 828, a result which spawned two separate concurring opinions terming it "distasteful." Id. at 463, 464, 689 A.2d 828 (Baime, J.A.D., and Levy, J.A.D., concurring.).[4] I submit that the comments in the Rutgers majority opinion relating to a same-sex marriage were simply dicta and not authoritative or persuasive in this case.
The other case, M.T. v. J.T., 140 N.J.Super. 77, 355 A.2d 204 (App.Div.) certif. denied, 71 N.J. 345, 364 A.2d 1076 (1976), is cited and quoted for its support of the historic understanding of marriage as the lawful union of a man and a woman. Interestingly, M.T. was both. Born a man, he cohabited with J.T. in a homosexual relationship for five years and then underwent transsexual surgery which involved removal of his male sex organs and the construction and placement of "a vagina and labia adequate for traditional penile/vaginal intercourse." Id. at 80, 355 A.2d 204. M.T. and J.T. later married in New York and continued their cohabitation, this time as husband and wife, for two years in New Jersey during which time they regularly engaged in sexual intercourse. Id. at 79, 355 A.2d 204. After they separated, M.T. filed a support complaint as a non-working wife. J.T. countered that he had no obligation to pay support because M.T. was in reality a man and that therefore their marriage was void. We held that M.T. was a woman, that the marriage was valid and that she was entitled to support for the following reason:
Plaintiff has become physically and psychologically unified and fully capable of sexual activity with her reconciled sexual attributes of gender and anatomy. Consequently, plaintiff should be considered a member of the female sex for marital purposes. It follows that such an individual would have the capacity to enter into a valid marriage relationship with a person of the opposite sex and did so here.
[Id. at 89-90, 355 A.2d 204.]
I gather from M.T. that a relationship qualifies as a lawful marriage if the genitalia of the partners are different so that they can engage in sexual intercourse. Accordingly, history and procreation are irrelevant provided surgery is successful, and the new woman and her partner are then entitled to a constitutional right to marry that neither he nor she had in the pre-op room. Constitutional rights should not be limited by genitalia or the ability to engage in a particular form of sexual intimacy. See, Lawrence, supra, 539 U.S. at 575, 123 S.Ct. at 2482, at 156 L.Ed.2d at 523.
The arguments based on tradition, history, promotion of procreation or existing case law do not justify a definition of marriage which proscribes plaintiffs from asserting their right to marry the person of their choosing under Article I, paragraph 1 of the Constitution. That provision reads as follows:
All persons are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property, and of pursuing and obtaining safety and happiness.
The expansive language of this paragraph has been interpreted by our Supreme Court to guarantee all substantive rights of due process to all persons as well *287 as equal protection of the laws of this State. Sojourner A., supra, 177 N.J. at 332, 828 A.2d 306; Doe v. Poritz, 142 N.J. 1, 8, 662 A.2d 367 (1995); Greenberg, supra, 99 N.J. at 568, 494 A.2d 294. While the Federal Constitution remains the primary source of individual rights, the New Jersey Constitution is a separate source of individual freedoms and may provide more expansive protection of individual liberties. See, e.g., State v. Novembrino, 105 N.J. 95, 146, 519 A.2d 820 (1987) (exclusionary rule unaffected by federal good faith exception); Right to Choose v. Byrne, 91 N.J. 287, 300, 450 A.2d 925 (1982) (statute restricting Medicaid funding abortion to circumstances where necessary to saving life of mother held to be a denial of equal protection contrary to Harris v. McRae, 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980)); State v. Schmid, 84 N.J. 535, 559, 423 A.2d 615 (1980) (broader concept of individual rights of speech). See also, Justice Stewart G. Pollock, Adequate and Independent Grounds as a Means of Balancing the Relationship Between State and Federal Courts, 63 Tex. L. Rev. 977 (1986); Justice William J. Brennan, State Constitutions and The Protection of Individual Rights, 90 Harv. L. Rev. 489 (1977).
Plaintiffs base their due process challenges on the constitutional right of privacy recognized in Article I, paragraph 1 of the New Jersey Constitution. At first blush, plaintiffs' claim of a right of privacy in support of a right to marry may seem anomalous, for privacy is commonly understood with a right to be left alone as famously discussed in legal parlance by Justice Brandeis in The Right to Privacy, 4 Harv. L. Rev. 5 (1890). But the constitutional right of privacy also means the right of an individual to make his or her fundamental life choices rather than the State making those decisions. See generally, Hoehengarten, supra, 103 Yale L.J. at 1524-30; see also, Jeb Rubenfeld, The Right to Privacy, 102 Harv. L. Rev. 737, 754-56 (1989). So a married couple may choose not to procreate by using contraception. Griswold, supra, 381 U.S. at 484-85, 85 S.Ct. at 1681-82, 14 L.Ed.2d at 514-15. A woman may make her own decision whether to bear or beget a child. Roe, supra, 410 U.S. at 153, 93 S.Ct. at 727, 35 L.Ed.2d at 177 (1973); Right to Choose, supra, 91 N.J. at 305-06, 450 A.2d 925; Planned Parenthood v. Casey, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992). Two consenting adults, heterosexual or homosexual, may elect to engage in sexual relations. Lawrence, supra, 539 U.S. at 578, 123 S.Ct. at 2484, 156 L.Ed.2d at 525; State v. Saunders, 75 N.J. 200, 381 A.2d 333 (1977). And a person may elect to discontinue life support knowing that death will result. Quinlan, supra, 70 N.J. at 10, 355 A.2d 647. In all these and other cases the law has recognized rights of individuals to make fundamental life decisions in the conduct of their lives despite State opposition. We should do so here.
Of course there are proper limits in an individual's rights of choice, just as there are proper government limits on privacy and liberty. But when the limitation amounts to a prohibition of a central life choice to some and not others based on sexual orientation, it constitutes State deprivation of an individual's fundamental right of substantive due process as well as equal protection of the laws.
Which leads me to polygamy. My colleagues view the nature of the right to marry asserted by plaintiffs as equally applicable to polygamy. The spectre of polygamy was raised by Justice Scalia in his Lawrence dissent in which he expanded a slippery slope analysis into a loop-de-loop by arguing that decriminalizing acts of homosexual intimacy would lead to the downfall of moral legislation of society by implicitly authorizing same-sex marriage and *288 polygamy as well as "adult incest, prostitution, masturbation, adultery, fornication, bestiality and obscenity." Lawrence, supra, 539 U.S. at 590, 123 S.Ct. at 2490, 156 L.Ed.2d at 533 (Scalia, J., dissenting).[5]
It is just as unnecessary for us to consider here the question of the constitutional rights of polygamists to marry persons of their choosing as it would be to join Justice Scalia's wild ride. Plaintiffs do not question the binary aspect of marriage; they embrace it. Moreover, despite the number of amicus curiae briefs filed in this appeal and the myriad of views presented, no polygamists have applied. One issue of fundamental constitutional rights is enough for now.[6]
Challenges to state laws on grounds of a right of privacy impact both substantive due process and equal protection. While analytically distinct, these concepts are linked and tend to overlap constitutional adjudication involving marriage, family life and sexual intimacy. Lawrence, supra, 539 U.S. at 575, 123 S.Ct. at 2482, 156 L.Ed.2d at 523; Goodridge, supra, 798 N.E.2d at 953. Early decisions considered the right to marry as a matter of liberty within due process protection, Meyer v. Nebraska, 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042, 1045 (1923). In Griswold, supra, 381 U.S. at 484-85, 85 S.Ct. at 1681-82, 14 L.Ed.2d at 514-15, the majority found a right of privacy inclusive of marriage in the "penumbra" of the First, Third, Fourth, and Ninth Amendments of the Federal Constitution. A right of marriage was held to be inherent in substantive due process, Zablocki, supra, 434 U.S. at 383-86, 98 S.Ct. at 679-81, 54 L.Ed.2d at 628-30, and as a protectable interest for equal protection of laws in Skinner, supra, 316 U.S. at 541-42, 62 S.Ct. at 1113-14, 86 L.Ed. at 1660. In all instances the right to marry was heralded as a fundamental right subject only to reasonable State regulations such as the banning of incestuous marriages, N.J.S.A. 37:1-1, bigamous marriages, N.J.S.A. 2C:24-1, and marriages to those persons mentally incompetent, N.J.S.A. 37:1-9.
In adjudicating claims of constitutional right of substantive due process or equal protection, our Supreme Court has eschewed the multi-tiered analysis employed by the United States Supreme Court in cases such as City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 440, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313, 320 (1985) and Carey v. Population Services Intl., 431 U.S. 678, 686, 97 S.Ct. 2010, 2016, 52 L.Ed.2d 675, 677 (1977). Aptly described in dissent by Justice Clifford as a "veil of tiers," Matthews v. City of Atlantic City, 84 N.J. 153, 174, 417 A.2d 1011 (1980) (Clifford, J., dissenting), the federal framework tends to be inflexible and shroud the "full understanding of the clash between individual and governmental interests." Planned Parenthood of Cent. N.J. v. Farmer, 165 N.J. 609, 630, 762 A.2d 620 (2000). See also, Robinson v. Cahill, 62 N.J. 473, 491-92, 303 A.2d 273, cert. denied sub. nom., Dickey v. Robinson, 414 U.S. *289 976, 94 S.Ct. 292, 38 L.Ed.2d 219 (1973). In its place our Supreme Court has adopted a test to evaluate claims of due process or equal protection under the State Constitution by examining each claim of right on a continuum and weighing the extent of the right asserted, the governmental restriction challenge and the public need for the restriction. Greenberg, supra, 99 N.J. at 567-69, 494 A.2d 294. See also, Planned Parenthood, supra, 165 N.J. at 629-31, 762 A.2d 620; Right to Choose, supra, 91 N.J. at 299-301, 450 A.2d 925. This balancing test is especially appropriate where, as in this case, state law infringes on a fundamental right such as the right to marry. Greenberg, supra, 99 N.J. at 571, 494 A.2d 294; see also, Right to Choose, supra, 91 N.J. at 308-09, 450 A.2d 925; United States Chamber of Commerce v. State, 89 N.J. 131, 157-58, 445 A.2d 353 (1982).
The right to marry is to my view a fundamental right of substantive due process protected by the New Jersey Constitution and, for the reasons stated earlier, the exclusion of plaintiffs from the right cannot be justified by tradition or procreation. The balancing test then considers the extent to which the governmental restriction impinges upon that right. Greenberg, supra, 99 N.J. at 567, 494 A.2d 294. Here there is not only a restriction but a prohibition which excludes a sizeable number of persons and their children from the personal, familial and spiritual aspects of marriage. Finally, the balancing test inquires as to the public need for the restriction, or as in this case, the prohibition of the right. Ibid. Here the majority and concurring opinions again rely on history, tradition and procreation. It is not necessary to repeat all the arguments set forth earlier in this dissent. Tradition in itself is not a compelling state interest. If it were, many societal institutions as well as individual rights would be compromised. After all, slavery was a traditional institution for over 200 years. See, People v. Greenleaf, 5 Misc.3d 337, 780 N.Y.S.2d 899, 901 (Just.Ct.2004). To deprive plaintiffs of marrying the person of their choice, a right enjoyed by all others, on the basis of a tradition of exclusion serves only to unjustifiably and unconstitutionally discriminate against them. Moreover, procreation is even less persuasive as a public need. Can there be serious thought that legal recognition of same-sex marriage will significantly reduce heterosexual marriages or the birth rate? While some cases do link defining of marriage solely to members of the opposite sex to "the survival of the [human] race," see, e.g., Baker, supra, 191 N.W.2d at 186, I cannot fathom that a list of threats to our survival would include same-sex marriage. Also if there is an under-population crisis, somehow it has escaped my attention.
Even if plaintiffs' claim of a right to marry is not considered a fundamental right, their constitutional challenge meets the "rational basis test," which is the third tier of the Federal tiers test. Briefly, the first tier requires "strict scrutiny" for legislative acts directly affecting fundamental rights; a lesser standard of "important government objections" is the intermediate tier test where a substantial right is indirectly affected or a semi-suspect class, like gender, is involved; and the bottom rung is occupied by other governmental acts for which the State must show only that the law rationally relates to a legitimate interest. Greenberg, supra, 99 N.J. at 564-65, 494 A.2d 294.
While the balancing test stated in Greenberg still sets the standard, I believe that plaintiffs prevail on their constitutional challenge even if the least restrictive or "rational basis" standard of review is employed since there is no showing of a basis of other than tradition or procreation to *290 exclude plaintiffs from the significant (if not fundamental) state of marriage. See, Goodridge, supra, 798 N.E.2d at 961 ("[W]e conclude that the marriage ban does not meet the rational basis test for either due process or equal protection.").
As to equal protection, my conclusion is the same. Our Constitution and the Federal Constitution require that all similarly situated people be treated alike. Cleburne, supra, 473 U.S. at 439, 105 S.Ct. at 3254, 87 L.Ed.2d at 330; Brown v. State, 356 N.J.Super. 71, 79, 811 A.2d 501 (App.Div.2002). It is disingenuous to say that plaintiffs are treated alike because they can marry but not the person they choose. By prohibiting them from a real right to marry, plaintiffs as well as their children suffer the real consequences of being "different." While the Domestic Partnership Act gives, at some cost, many, but not all, of the benefits and protections automatically granted to married persons, we have learned after much pain that "separate but equal" does not substitute for equal rights. Plaintiff Sarah Lael describes the difference in this way:
For me, being denied marriage, despite how hard we work and support each other and our children, it is demeaning and humiliating. These feelings are part of my daily life ... because of constant reminders that we are second class.
What Sarah Lael and her partner lack and seek may be summed up in the word dignity. But there is more they will gain from lawful marriage. That something else goes to the essence of marriage and is probably best left to poets rather than judges. It is the reason that people do get married. For marriage changes who you are. It gives stability, legal protection and recognition by fellow citizens. It provides a unique meaning to everyday life, for legally, personally and spiritually a married person is never really alone. Few would choose life differently.
With great admiration for the wisdom, logic and eloquence of my colleagues, I must dissent.
NOTES
[1] There also have been a number of state lower court decisions, mostly unpublished, that have concluded that the limitation of marriage to members of the opposite sex violated those states' constitutions. See, e.g., Brause v. Bureau of Vital Statistics, No. 3AN-95-6562 CI, 1998 WL 88743 (Alaska Super.Ct. Feb. 27, 1998); Li v. State, No. 0403-03057, 2004 WL 1258167 (Or.Cir.Ct. Apr. 20, 2004). Several of those decisions were promptly followed by the adoption of constitutional amendments prohibiting same-sex marriage. See, e.g., Alaska Const. art. I, § 25; Or. Const. art. XV, § 5a; see Li v. State, 338 Or. 376, 110 P.3d 91, 98 (2005) (recognizing that, as a result of the constitutional amendment in Oregon, the institution of marriage in that State is now limited to "opposite-sex couples.").
[2] The Attorney General disclaims reliance upon promotion of procreation and creating the optimal environment for raising children as justifications for the limitation of marriage to members of the opposite sex. However, several amici curiae, including the New Jersey Coalition to Preserve and Protect Marriage, the New Jersey Family Policy Council and the New Jersey Catholic Conference, argue that our current form of marriage provides an environment in which procreation may be embraced and the optimal condition established for child rearing. Although an amicus curiae is ordinarily limited to arguing issues raised by the parties, an amicus may present different arguments than the parties relating to those issues. See James v. Arms Tech., Inc., 359 N.J.Super. 291, 324, 820 A.2d 27 (App.Div.2003); Keating v. State, 157 So.2d 567, 569 (Fla.Dist.Ct.App.1963) (noting that an "amicus is not at liberty to inject new issues in a proceeding ... [but] is not confined solely to arguing the parties' theories in support of a particular issue."). We also note that plaintiffs were afforded an adequate opportunity to answer those arguments; in fact, half of their reply brief is devoted to those arguments. Therefore, we consider the amici's arguments regarding procreation and child rearing to be properly before us. In any event, there is no need for us to determine the validity of those justifications for limitation of the institution of marriage to opposite-sex couples. We only note that the historical and prevailing contemporary conception of marriage as solely a union between a single man and a single woman is based partly on society's view that this institution plays an essential role in propagating the species and child rearing.
[3] For a general discussion of the institution of polygamous marriage, see Richard A. Posner, Sex and Reason 253-60 (1992).
[4] This is not to suggest that there are no public interests served by the limitation of the institution of marriage to members of the opposite sex. As discussed in section I, this limitation is deeply rooted in our nation's history and traditions and contemporary religious and cultural values, and also supported by the public interests discussed in depth in Judge Parrillo's concurring opinion. See infra, 378 N.J.Super. at 197-200, 875 A.2d at 276-78. However, the State is not required to show that those interests outweigh a presumed right of same-sex couples to marry in order to defeat plaintiffs' equal protection claim.
[1] Unlike the usual contexts in which privacy and liberty interests are asserted, namely to seek protection from unwarranted governmental intrusion into matters of intimate personal concern, In re Grady, 85 N.J. 235, 249-50, 426 A.2d 467 (1981); In re Quinlan, 70 N.J. 10, 40, 355 A.2d 647 (1976), cert. denied sub nom., Garger v. New Jersey, 429 U.S. 922, 97 S.Ct. 319, 50 L.Ed.2d 289 (1976), or to gain the right to engage in private conduct without criminal sanction, State v. Saunders, 75 N.J. 200, 216-17, 381 A.2d 333 (1977), plaintiffs here affirmatively seek public approval of purely private behavior.
[1] In 1947 thirty-one of the forty-eight states had criminal statutes punishing those who entered into such marriages as well as those who performed them. Twenty years later when Loving was decided, sixteen states still had these laws. Robert J. Sickels, Race, Marriage, and the Law, 64 (1972); James Trosino, American Wedding: Same-Sex Marriage and the Miscegenation Analogy, 73 B.U. L. Rev. 93 (1993).
[2] A somewhat contrary view of history is set forth in William N. Eskridge, Jr., A History of Same-Sex Marriage, 79 Va. L. Rev. 1419, 1435-84 (1993). Compare, George W. Dent, Jr., The Defense of Traditional Marriage, 15 J.L. Pol. 581, 593-601 (1999).
[3] Two important legal distinctions between domestic partners and married persons are that (1) property acquired by a partner during a domestic partnership is treated as individual unlike in a marriage where joint ownership may arise as a matter of law; and (2) the status of domestic partnership "neither creates nor diminishes individual partners' rights and responsibilities toward children, unlike in a marriage where both spouses possess legal rights and obligations with respect to any children born during the marriage." N.J.S.A. 26:8A-1.
[4] The Legislature subsequently remedied the matter through the Domestic Partnership Act. N.J.S.A. 26:8A-1 to -12. See also, N.J.S.A. 18A:66-2; N.J.S.A. 43:6A-3; N.J.S.A. 43:15A-6; N.J.S.A. 43:16A-1; N.J.S.A. 52:14-17.26.
[5] Justice Scalia's tirade spawned many scholarly articles on privacy and polygamy. See, e.g., Joseph Buzzuti, The Constitutionality of Polygamy Prohibitions After Lawrence v. Texas: Is Scalia a Punchline or a Prophet?, 43 Cath. Law. 409 (2004); Cassiah M. Ward, Note, I Now Pronounce You Husband and Wives: Lawrence v. Texas and the Practice of Polygamy in Modern America, 11 Wm. & Mary J. Women & Law, 131 (2004).
[6] The curious may consider the following authorities in distinguishing polygamy. Richard A. Posner, Sex and Reason, 253-60 (1992); Alyssa Rower, The Legality of Polygamy: Using the Due Process Clause of the Fourteenth Amendment, 38 Fam. L.Q. 711 (2004). For a popular, albeit controversial, history of polygamy and Morman religious fundamentalism, see Jon Krakauer, Under the Banner of Heaven: A Story of Violent Faith (2004).